Thank you, Your Honor. And if you can hear me, may it please the court. I'm August Flangey with the Justice Department, and I'm here on behalf of the United States. I'm going to try and reserve five minutes for rebuttal. I see a clock counting down. The federal rules that were published last year represent 23 years of experience with the Flores Agreement. The rules implement the overarching goal of that agreement. They establish binding regulatory standards that treat all minors with dignity, respect, and special concern for their special vulnerability. Those rules and the many dramatic changes in the law and circumstances since 1997 call for permitting the rules to replace the Flores Agreement as the governing law in this 60B and emphasized by the Supreme Court in Horn and Rufo. The court in those cases were faced with decrees that were far less long-running and far less far-reaching than the one here. A flexible approach under Rule 60B is particularly warranted where the agreement itself was designed to be temporary. It anticipated terminating years ago upon the promulgation of rules under the APA and invoked an APA process that would have permitted changes to the rules to reflect new circumstances over the years. And as time passed, and indeed an APA process that requires rule makers to consider the circumstances today, not 23 years ago, in publishing new rules, and also requires them to consider comments from the public, not just from the plaintiffs. To be sure, termination of this agreement would not create a legal void. It will simply mean the comprehensive standards set forth in these new rules can be evaluated, they'll apply, they'll be binding, and they can be evaluated in their own terms under the APA and under applicable substantive law. And this is a process that has been halted by the District Court's order. We think the District Court erred and abused its discretion and joined the rules based on perceived conflicts with the Flores Agreement, which the Court, we think, overstated. Let's suppose, just a minute, your 60B argument, as I understand it, doesn't, the way you've just made it anyway, doesn't depend on whether they're overstated or not overstated. You're saying that the agreement should be terminated regardless of how much, whether there is a substantial difference, or to accompany minor, between the two, between the agreement and the rating. But your ultimate argument is that doesn't matter. What are the change circumstances? I want to apologize. Your audio is coming in and out, so I heard. I'm sorry. Is this any better? Yes. Yes. All right. Do you want me to do it again? My basic point, my basic question is, let's assume that, at least with regard to accompanying minors, there are major or significant differences. As I understand your argument, that wouldn't necessarily matter. So, if there were, in fact, the requisite change circumstances that justified modifying the agreement. Now, you're not asking to modify the agreement. You're asking to terminate it, which is another question. So, I guess I have two main points of inquiry. One, how do the particular changes, particularly the factual changes, link up to the differences or the need to change the agreement from what it's been interpreted to be? And B, since you've asked to terminate it and not modify it, does that make a difference? And I want to say, we think these factors that Horn and Rufo talk about all play off each other and work together. So, we're not relying on any one part of that decision. I think those decisions talk about the passage of time, changes in the law, changes in circumstances, whether there has been a durable remedy created by other means, which we think the new rules are, and just the notion that this is so broad and covers such a large portion of the immigration system. It's both unmanageable as a class action and has serious implications for democratic processes to have it operated under a consent decree. So, we think all that works together, but I think I also want to dispute the notion that there's a radical change with respect to family custody in these rules. And I think... Hopefully, you're kind of feeding out. I'm... Oh, I don't... I will try. I think we're all having the same problem. I will try to... I'm hearing you fine. So, there's some disconnect. Okay. I'll do my... I'll be as loud as I can without yelling. We would dispute the notion that the family custody provisions are a significant departure from the Flores Agreement. I want to be very clear about that. The judge relied almost exclusively on that issue with respect to family custody, but this court in 2016 said quite clearly that, quote, the parties gave inadequate attention to the problems of accompanied minors. I have to say, I think the language was a little less clear than that, and the side to which the ultimate conclusion was that the agreement applies. Now, I mean, one of the problems with this case is that you don't think the agreement applies, saying that, the government. And it's hard to escape the conclusion that a lot of what's going on here is an attempt to implement the understanding that it doesn't apply. So, we have to take that off the table. As far as we're concerned, as a three-judge court, it applies. And with that understanding, why isn't this a major departure? And does it matter whether it's a major departure from your point of view, in terms of your argument? Well, saying that the agreement applies to accompanied minors, which I agree is binding precedent in this court, does not answer the question of whether the rules square with the Flores Agreement provisions. And I think what I'm trying to say is, in this court's ruling that it applies, this court also was very clear to say that the Flores Agreement didn't answer key questions about how to handle accompanied minors. So, there was a regulatory void that this court acknowledged, and the provisions that the lower court had concerns about were filling that void. And they did not directly contradict anything in the agreement. Well, but address this. I think part of the district court's problem with these proposed rules, I think especially as pertained to accompanied minors, is that I think she called it aspirational or precatory and not really regulatory commands. What's your response to that? The lower court, in primarily talking about the HHS rules that pertain to unaccompanied minors, was concerned that some of them were used the present tense rather than the word shall, and therefore were not binding obligations. The regulatory preamble makes clear that they are binding. If I can interrupt, I'm not so sure I agree with that. The present tense verb looks, if I'm just reading it, it is telling me that that's what the agency in that circumstance does. It doesn't tell me at all that there's an obligation. And if you're telling me to look elsewhere from the text, that's a very odd way to write a binding obligation. I mean, I think it comes from the fact that HHS is talking about what it's doing in the regulation as opposed to the consent decree where the court or plaintiffs are telling HHS what it is. And I don't think that's meant to be a substantive change, the preamble regulation. Can you point to regulatory language elsewhere that's written that way? I understand the will point, that's a different thing. But in terms of this statement of current conditions, which is all that these sentences seem to be, it's hard to believe that it wasn't purposeful. Why would reflect ongoing duties and obligations of HHS and ORR? And that's, I think, the cases that the plaintiffs cite. And there's the Tin Cup case and the Norton Supreme Court case. They talk about very different circumstances. And the court in Norton said, you have to look at all the surrounding circumstances. Here, the surrounding circumstances, which include the preamble that says these are binding obligations with respect to consent. So, in other words, you would have no objection if the modification were denied to the degree that you have to put back in the shall? Well, I think we'd say first, this court can make clear that the obligations are binding. We would welcome that. If the court thinks that the only problem with these regulations are the need to do that. That, I'm afraid, is not my only problem. I'd like to return to Judge Berzin's question, really, which is to say, we've had a number of changes. And I'll just go over them very quickly, just alluding to them without describing them in any detail. We've reduced the number of custodians from six to three. We've changed and eased up the licensing requirement for the facilities. There's been a redefinition of a secure facility. There's been an easing off as to who gets to conduct the bond here. Now, all of those are significant changes. And your argument is the changed conditions on the ground are linked up and justify those changes. I don't understand what the linkage is. Well, the first four that you mentioned all have to do with family custody. And the change on the ground. I understand that. But we've always had family custody. We've got more families. But I don't understand why more families means you get to make more changes in response. Again, that is a major component of the immigration challenge today. And one that this court said the parties didn't really address the details of. So it said the parties did not address the, quote, quote, complex issues involving the housing of family units, end quote. If the parties didn't address it, the way they handle licensing and the way they handle... They didn't address it because the agreement treats the company minors the same way. First of all, I'm having trouble hearing you. I'm sorry. I don't know why. Maybe a little closer to the mic. That's really odd because I've done this so many times and I haven't had a problem. Anyway, let me try. Is that better? Yeah, much better. Okay. So the... I lost my train of thought. Basically, I guess I have judge pleasure. First of all, as I understand it, there are now two family detention centers in the country. Is that right? There are three. Two in Texas and one in Pennsylvania. Okay. They're in Texas and they're in Pennsylvania. And they house a minuscule percentage of the large number of people that you're referring to, right? Well, I mean, the current conditions are very different than they were not too long ago given COVID-19 and just a lot of significant action since then. So they're very... All right. Let's say in February they housed a minuscule percentage of the huge influx that you're talking about. So how does it matter? How does this large number showing up at the border have to do with the actual conditions that are being addressed by the change in the And I think it's a big enough number that if you could link it up to the need for change, it might mean something. But what is the... How does it link up? There have been repeated border crises that are driven by irregular family migration over the last six years. There's no denying that. This has been a crisis... Okay, but we're not dealing with the border. We're dealing with inside the country when people are detained. I mean, there's no dispute in this case, as I understand it, about the regulation as it applies to the conditions directly at the border. The initial detentions that were addressed in Flores 3. I do not understand there to be a dispute in this case about that. That is exactly what the lower court focused on in invalidating this entire regulatory scheme. I'm sorry. I don't think she focused on it at all. I thought that the conditions when people first come over the border and these temporary detentions was not the subject of this. Yeah, I'm sorry, Your Honor. I thought you were talking about the next period. So therefore, and as to the next period, we seem to be talking, I don't know why, I don't understand the dynamic, of a quite small number of families. Is that correct? No, I think... Under a thousand people, as I understand it. Currently or again? In February. Let's take February, okay? In terms of the three detention centers. One had 80 or 90 people, one had 600 people, and I don't know about the third. That sounds right. I don't know the precise February numbers. So what does the huge influx at the border have to do with this? Again, there have been these crises at the border over the last six years. There have been multiple crises and there are no rules for family custody. The Flores Agreement, as this court said, it covers accompanying minors, but it said the rules just aren't well developed. So we need rules. We need some clear rules. What it actually said, as I understand it, is the rules are well developed, but maybe if somebody had thought about it, they wouldn't apply the same rules to the family accompanied children as to the unaccompanied children. Let's talk about one in particular, Rule 14, which is what Judge G focused on. That's the release and reunification rule. It says DHS, if they're not a flight risk, shall release and reunify with a series of custodians in an order of preference. The first two custodians are the parent and the legal guardian, but the child is with the parent and the legal guardian or the legal guardian. But they're not released. It's a section about release. It's about release and reunification and it simply does not answer the question what you do when the child is with the parent, can safely stay with the parent in a licensed family residential center, which did not exist in 1997, which complies with all of the requirements of the Exhibit 1 to the Flores Agreement, which are the core provisions designed to create custody environment that is suitable to child welfare, which all apply under these rules to the family residential centers. And it did not address the issues of what happens if you separate the inquiries for the child and the accompanying parent. This court last year said, well, there's a lower parole standard for the child, a higher parole standard for the parent. And if a parent is, if both of them get that parole inquiry, it could often result in different answers on parole. The rule fixes that. The rule makes clear that during this brief period where credible fear is decided, and again, I want to stress, this is a short period. Judge G wants it to be under 20 days and the agencies that work to make it as fast as possible under the circumstances. It's a short period when the district court allowed family residential centers to be used so the family could stay together and this credible fear processing could be looked at together. And there would be no law that would require different standards for the different members of that family. That is a reasonable way. But then, as I understand it, if there is a credible fear determination, there are different standards. And there are different standards, as I understand it, because the children can be released under the humanitarian provision and the parents can't. After credible fear, the family can really be released under the same standard, humanitarian provision, likely won't not apply risk or danger under the revised parole standard, which this rule creates. So it creates a parole standard that allows release under this section, excuse me, the paragraph 14 standard for if they establish credible fear, but for the brief period it's I was confused. I thought that was only for the children. I mean, I think the regulation is for the children. But again, the it allows the and again, I I need to look again at exactly what the regular the post credible fear parole standard is for adults. But I think I think the idea was to line those up both before credible fear, when there was a dispute last year over whether they should be lined up and after credible fear when I don't think there's ever been a dispute about the lineup. And so to facilitate the family being processed under that credible fear process as a unit with without issues of family separation without issues of are they going to have to waive one consent decree or another consent decree and the notion that the floor is agreement addresses this and let me add to that the notion that a core purpose of the fuller's agreement was to require a child's release when the child could be with the parent in custody in a safe environment for a short period of time is just not a fair assessment of what the parties were doing back in 1997. Where does the short period of time? Again, the credible fear processing is designed to be fast. And if you look at Well, during removal proceedings, again, I don't think there's a dispute for plaintiffs that the standards are satisfactory. And Mr. Hoagley might just might talk about that as part of the argument. But the real focus of Judge G was before the credible fear determination is made in that period, where last year, this court said you had different parole standards for the parents and the child. And as far as the time for credible fear, and we've been having a fact finding on that recently, but in the thing that's in the record at ER 198 to 199 is the monitors August 2019 report. That report says 75% of class members were out of ice custody within 17 days. 90% were out of ice custody within 23 days. And so it's designed to be it's expedited removal. The point is to do it promptly. And that is kind of the way it's designed to be. And I think the rules took those challenges and came up with a pretty solid solution. And we're running over time, but we'll make sure you get a chance to respond. I've got a question about the relation between the significant influx of families at the border, and the argument you're making here, the argument is dependent on large numbers of families actually within the country. But of course, most of these families are being not allowed to be held at the border. We've got two of them. One of them says, well, you wait for your hearing while you stay in Mexico. The other one says you're ineligible unless you've applied for and been denied asylum in either Mexico or Guatemala. So the truth is, you don't have very many people in the country. So tell me more about the change conditions for the additional people required because they're not here. Sure. And I mean, we've talked about the change conditions over the years and there's no and again, what happened in 2018 to 2019 was a crisis situation at the southern border. I think that's the question. The question is, I don't think you've got very many people actually in the country to whom this new regulation applies. Yet you seem to be telling us you're justifying the new regulation because there's so many people. But there aren't very many people because they're being held outside the country. I want to be clear. We are relying on several about how many people are at the border today or in 2019 or in February. It's about the fact that without a durable system to address the situation, which the Flores Agreement doesn't include, there are repeated migration crises and they will happen again. And when it happens again, we don't have clear rules on how to address it. We have constant litigation under the Flores Agreement, which was never designed to address this, which this court said didn't address all these details. It would be much better to have these rules. It does address the details. We just don't like the way it comes out. In other words, it addresses the details. It says the order in which people have to be, children have to be released. They do have to be released. They do have to have bond hearings. It says that they have to be in state-licensed facilities. And it happens, as I understand it, the two states where there are these facilities do have state license for the facilities. So there are state-licensed facilities, but in Texas and Pennsylvania, they could be licensed. So it isn't that there aren't rules. It's that you don't think they're appropriate. You know, this court addressed this issue in 2016 and said the settlement does not address the complex issues involving housing of family units. That includes licensing. That includes egress. That includes things that this rule tried to fully defers to state licensing. If a state is going to regulate, we will comply with those state standards. And the two states with facilities do regulate, and it all works together well. The only issue there is if a state declines to regulate. And as this court held last year in U.S. v. California, the state can't use its regulatory authority to prohibit immigration detention. So I think that rule addresses the state licensing in a very reasonable way, and it incorporates the agreement in light of the fact that the parties didn't really contend. And when we were here in 2016, we said, well, it's clear this agreement didn't cover unaccompanied minors because there was no provision for licensing for families. And this court said, it does cover unaccompanied minors, but you're right. They didn't really contend with how the custody is going to work. And now it's been flipped on us again to say, oh, you can't even do that licensing. You agreed to it long ago. And it's just those two considerations just can't go together. Yeah, I think we have your argument in hand. Let's hear from the other side. And you'd ask if you're over five, but we'll give you a chance to respond. We'll make sure that you don't get cut off. Thank you, Your Honor. Yes, may it please the court. This is Carlos LeGuin with the Center for Human Rights and Constitutional Law on behalf of plaintiffs. I think there were a number of issues I'd like to clarify in my opponent's argument. I mean, the first really is that the unstated rationale for defendants' desired changes is that indefinite detention of accompanied children will deter others from seeking to enter the United States without authorization. That really is what it boils down to. I have a made that this is all about the period before credible fear determination. Is that right? No, it is not, Your Honor. First of all, not everyone passes the credible fear determination. And so then the question becomes, how long are they going to be detained while they seek to have that reviewed by an immigration judge or even a court of appeals? So the assumption of my opponent's argument seems to be that everyone's going to be released once they establish a credible fear. The question becomes not only how long does it take for them to get through that process, but what happens when they fail to persuade the frontline immigration officer that they have a credible fear of return? But even if they do have a credible fear, does that get the parents released? Well, this court has held that there is no obligation for government to release parents under the Flores settlement. That's settled law. But what parents and families should have the right to do is to elect to have their children housed in properly licensed facilities, if they so wish, for however long their children are going to be detained. And if they have relatives and other individuals in the United States who are available to receive their children, they can make that decision to have their children released while the children go forward. So are you saying that new regulation allows them to have their children released even if they're not released at that point once there's a credible fear? I mean, it seemed to me to be kind of vague. I said, well, maybe, but it's completely unreviewable. Well, Your Honor, the big change in the regulation is that what would happen under the regardless of the parents' wishes for howsoever long it may take them to complete their asylum or removal proceedings. In other words, it would be up to the discretion of the government to release or not. Whereas under the settlement, there is a clear obligation that they do so as long as the child is not a flight risk, is not dangerous, and there is a suitable custodian. Are their parents getting released? That would be the microphone. I'm having trouble hearing you. I'm really sorry. Okay. I keep trying to... Are the parents being released at that point? That is, again, up to the government to do. The parole regulations do not impose any kind of mandatory obligation to release anyone. It's completely up to the discretion of the government. But I thought the regulation was saying with regard to adults that they aren't re-released even while they're in the credible fear proceedings as long as, except for medical reasons or something else. That is the general approach of the regulations, Your Honor. So yes, the presumption is in favor of detaining the parents, whereas the Florida settlement requires a presumption in favor of release of the children. This is what's called a binary choice. No one's happy with it. But if the government insists on detaining individuals or families in order to deter others from coming forward, the limits of the law are what we have to live within. Okay. So basically, what's at stake here really is a subset. If the parents wish the children to stay with them in detention and the parents are detained, there's nothing in the Flores agreement that says that the children have to be released. So what's at issue here is the situation in which the parents are willing to have the children to be out of custody in one of the circumstances described in the Flores agreement. I mean, that's the basic difference. Is that my understanding? That's the basic difference with respect to release of accompanied minors. Yes. Of course, there are a number of other differences with the regulations that Your Honor cited earlier, which we also believe are very important. But yes, with respect to the release of accompanied minors, that is the major difference. You know, you just said, well, and there are other important ones that I listed. Tell me, review those for me, because those seem to me having to do with the release that it's a bond hearing and so on. So say more. Well, the first is that is that the type of facility in which children are to be kept, the Flores settlement requires that they be licensed by the state in which the facility is located as suitable for dependent children. Now, that's after they're released, correct? No, this is while they remain in immigration related custody. But with parents or not with the parents? The settlement does not distinguish between accompanied and unaccompanied minors. It simply says all children, all class members are entitled to be placed in a properly licensed facility for howsoever long the government keeps them in immigration. So even if they're with the parents, of course, they must be in a licensed facility. Unless the parents decide to decide to waive that, right, of course. Now, what the government has done here is that many states, perhaps even the majority, do not deem appropriate facilities in which children have regular daily contact with unrelated adults as being suitable for dependent care licensing. That really is the government has here. Now, I thought that only Pennsylvania and Texas licensed these facilities. But they're also the only two states where there are such facilities. They are the only two states where there are presently such facilities. Now in Texas, the licensing status of the Dilley and Carnes facilities is up in the air. In Pennsylvania, there's also litigation surrounding that. But not because the statutes don't apply to them. Presumably because they're not, there's a dispute about whether they're compliant, but not because you couldn't license such a facility. Is that right? I would have to get back with the court on the details of what those disputes involve. I will say that most states will not license facilities in which children have regular contact with unrelated adults. But we can we can follow up with that with a post. But there isn't such a facility. Has there ever been such a facility in a state that doesn't license them? Has the federal government ever had such a facility? Well, yes, your honor. Texas initially would not license Dilley or Carnes. And the government went ahead and put their facilities there. There's been some efforts to get Texas to go along with the government's plan since then. But initially, it was just we're going to put the facilities here. We know they're not licensed. And we're just going to operate them without a license. So that has been the reality. And whether the... I mean, doesn't that give some credence to the notion that the agreement just didn't deal with this? I mean, because there was no understanding that this problem was going to exist, I suppose, because at the time, and this is what the, you know, versus Flores opinions, the understanding was with a family would be released, but they now they're not being released. Parents aren't. And this problem has developed, which didn't exist before. Why isn't that a reason that might substantiate some? Not necessarily termination, but some modification. Your honor, if you look at the regulations that were on the books at the time the Flores settlement was signed, you will see that there's a regulation that addresses the situation of families and encourages the government to release the families, parents along with the children. Now the government can decide that it does not want to release the parents and force the families into this binary choice. But that doesn't mean that the parties didn't understand that this was going to be a problem at the time that the settlement was aimed. And the very existence of a statute, of a regulation that addressed families at the time the settlement was entered into, I think forecloses the conclusion that the party simply didn't ever think about it. And it was never a problem until more recently. But if a family wants to keep the children with them, and they're in the facility, and the facility isn't licensed because it's someplace that won't license them, then that option, you say they have the option, but in a sense, they don't have the option. Well, if they want to remain, it is called a Sophie's choice, a binary choice, whatever you want to call it. It is not something that is pleasant. But the parents still and the families would still have the right to determine whether they want their children placed in a properly licensed facility, or whether they want them released to relatives that are outside of a licensed facility. Correct. Yes, that is the choice. That is the choice that the government has forced upon the families. We do not like it. But in 2016, the court ruled that the floor settlement does not give the parents any right to release. And so now we're forced with into this circumstance. But the point is, is that at least it's a choice that the families have, it is not a choice that the government is making for the families, regardless of their of their circumstance. But the remainder of the conflict between the regulations and the floor settlement are many. It's not only this one. There is the aspirational statements that Judge Hashim referred to earlier. We don't think that there's any reason their government has never given a coherent explanation as to why those changes, why they removed shall and substituted in present tense or even will for, for what the settlement says. And, and, and there, then there's the removal of the independent review of children's dangerousness and flight risk as grounds for contention. But the court informed some degree was not focusing on what the different and precise way in which the implementation was not consistent with the consent decree in one case, and I guess it was a, an adjudicated injunction in the other. Instead, they were concerned with whether there had been sufficiently changed circumstances that the government should have be able to go forward without the burden of the earlier decree. So I, for purposes of whether the thing self terminated, you know, which I think is a very weak argument on the government's side. Yes, these differences obviously matter, but for purposes of evaluating the notion that there should be a modification because of change circumstances, I don't know that these distinctions matter that much. Well, I think that again, your honor, the, the question then becomes how do the changes, the departures in the regulations from the settlement address the change circumstances. That I think is a fair question. Members of the court have already pointed out more than one. They, the only way that they make sense is if the government can justify those changes as a ground, as, as a means of deterring other immigrants from coming to the United States without authorization. And as we've pointed out in our briefing, that is an unconstitutional use of civil detention. Deterrence is something that is, should be confined to the criminal law. Now, the other part of this of course, is that, so the question really has to be is how does keeping children, removing the children from stripping them of their right to proper placement and to release, prompt release, how does that deter anyone from coming to the United States? We've submitted evidence and studies showing that that really does not work at all. And so the question then becomes what is the leakage between these changes and departures from, from the, from the settlement and how do they address the problem that the government in, in its, in many ways has created for itself because it refuses to leave, to release parents. Do you want to address the remedy question at all? I mean, there's, or the severability issue or whatever one wishes to call it. I gather that there are parts of these regulations that do mirror the agreement and with which you don't take issue and why, on the other hand, the government came in and wants to terminate the entire agreement. So what, is there some middle ground here? We sent you off to mediate and you got nowhere, but is there a, a middle ground in terms of something like sending it back to modify the agreement or terminate parts of it, but not other parts or something like that? Well, in terms of the agreement itself, the termination clause, after all, this is a contract and the termination clause is quite clear that either it is an all or nothing circumstance. What it, what paragraph 40 as modified by the stipulation says is quote, all terms of this agreement shall terminate 45 days following defendant's publication of final regulations implementing this agreement. So, so there is no indication from the text of the agreement itself that piecemeal interpretation, a termination was at all something the parties had agreed upon. Well, but, but do you think under the, you know, equitable consideration under rule 60, that could go to a modifying the termination clause? If, if the government would be equitable to do so with, with respect to some, but not all, all of the provision of the agreement. Plaintiffs would concede that under rule 60, if the defendants are able to make the showing required of under rule 60, that the court has broad discretionary authority to modify the agreement to suit current circumstances. But that is not, the reason I asked that question, you know, which is similar to judge Berzon's question. Most, I think most of your complaints to me, at least, you know, seem to be centered around the provisions that pertain to accompanied minors. And at least parts of the regulation that addressed unaccompanied minors, you know, you know, could be read as consistent with the agreement, even furthering the agreement. So you think there's a, it's, I don't want to say possible, but you think it makes sense to, you know, to, to accept the regulation that with respect to parts of the agreement, but not the entire agreement? Uh, I think your honor that the district court was under, um, uh, facing a very difficult circumstance. If it was going to do that, given all of the instances, for example, in which the present tense is substituted for the shall, uh, whether the court was going to go through the regulations, uh, which are quite extensive and, and begin to edit them. Uh, I, I believe that the judge G was correct in saying, you know, that's really not the district court's job to do, to rewrite the regulations here, to, to conform to the settlement. Um, you know, that being said, I, and so, so I believe that she was, uh, acted reasonably and with, uh, with concern for the confusion that would be created if these regulations were to be going into effect piecemeal. That being said, the plaintiff's interest in this circumstance is to have the, the agreement, uh, remain in effect. If the government believes the change circumstances of warrants and modification, they're free to move the district court to modify, uh, to modify the agreement to, to, to, to conform to the current circumstances. But, uh, to, to expect the district court to go through these regulations in parcel words, where the present tense is used versus shall is I think a heavy lift. Um, uh, as I said, the, the plaintiff's interest in this circumstance, however, is that the settlement remain in effect and binding. And if the court is inclined to grant at least that much from the court, uh, from the district court, at least at that extent, then we believe we can live with that. Yes. Any further questions from the bench? Um, uh, well, one question about the bond hearings. Why isn't that a pretty good example of something where there are changed circumstances, which is that the authority for, um, these, the, at least the unaccompanied children, and maybe that's the problem is that you're, again, you're not distinguishing between them has been transferred to HHS and what the regulations want you to do with regard to, I guess, just the unaccompanied children is to have what's portrayed as a full due process hearing, but with hearing examiners from HHS rather than from DOJ. Why is that a substantial, a, something other than a, a ministerial change to adjust to the changes in the, um, authority of, over these children? Uh, when, when, when this all began, DOJ was, was the sole responsible entity. So in that sense, the immigration judges were no more independent than, um, hearing examiners, hearing, um, administrative law judges at HHS are. So why isn't that a issue? Was, was hashed out extensively and, um, uh, in an opinion by judge Reinhardt. I was on the panel, right? And so I know what, and, and, and so the, the, the distinction, but that wasn't the question because the alternative at that point was, was not a formal due process hearing run by an independent ALJ and HHS. The alternative was, uh, some informal, um, extremely, um, inadequate procedure. So this seems to be trying, maybe it doesn't do it sufficiently, but it seems to be trying to simply move the same thing to a different agency. Maybe it's not sufficiently the same thing, but it's not what was at stake in Florida. It's doing in general. And some of it bothers me that you're not all that familiar with the other cases. I was there and I know what happened and that was not, yes, yes, you were your honor. Uh, I think the points are a couple. One is that, um, they've changed it from the regulation changes it from an opt-out to an opt-in procedure. That's one, which is significant when you're talking about children who don't speak English for the most part, don't understand the U S legal system. Uh, so it's a significant change. The second part, the government says that there are a total of like 80 such hearings last year. What, how was it, or at some year, what out of thousands, what, um, was the procedure that was being followed at that point? When you offer, have somebody have a hearing, don't you say, is it odd to say, okay, you have a hearing, here's a piece of paper. Um, and tell us if you want the hearing, is that what was being done anyway? No, what's been done. What's being done is essentially that children who are in, um, uh, placements have been, have been given, uh, bond redeterminations, whereas children who are not insecure placements, uh, there's been an opt-in process. That's, that was an agreement between the parties based upon the government's representation that children placed in licensed facilities or shelters are presumably not dangerous and not flight risks. Now that's something the government can change tomorrow if it sees fit. And at which point plaintiffs would on an automatic bond hearing for every child, regardless of the type of facility that they happen to be in. So, so there has been some accommodation on the, on the part of the parties when it has made sense to do so. And plaintiffs remain willing to modify the settlement or at least to, to agree that it, that, uh, deviations from it are appropriate given certain circumstances, but to eliminate the opt-in versus opt-out requirement entirely, which would then allow the government to, uh, uh, uh, declare children who are in, in, in, in licensed facilities as dangerous, too dangerous, or too much of a flight risk to release. That would be a major problem. Now, your problem isn't with the switch of agency. The problem with the switch of the agency, you know, theoretically, uh, plaintiffs might be satisfied if the, the process that, uh, HHS were to set up in lieu of an immigration judge hearing were as robust as the immigration judge proceeding. As the regulation now reads, it's nowhere near that. Uh, the EOIR or executive office of immigration review is insulated at least somewhat from the department of justice. It is within the department of justice, but it's got its own, uh, uh, uh, firewall, if you will. Uh, there's no indication that that would be the case with the HHS hearing examiners. They would not be judges. They would be, uh, people appointed by HHS itself as I read the regulation. So the, so the, uh, level of procedural protection is not nearly as robust as what would exist under the existing regime. Okay. If there are no further questions, uh, thank you very much. Now, uh, the government asked to reserve a five minutes. We took the government five minutes over. Let's put three minutes on the clock and see where we go from there forward. I can't, I can't hear the government. I'm still on mute. I'm sorry, your honor. Can you hear me now? Uh, first I want to just talk briefly about the bond hearing regulation. And one important thing I want to convey is that, uh, we took judge Reinhart's opinion to heart in that regulation. It adopts all of the protections he identified that were essential, uh, for a bond hearing procedure. And I'll go through them, uh, their rules. Now they have binding effect. Uh, they're not governed by a manual. There's no disrequired and notice in each individual case, uh, there's a right to submit evidence. There's a standard of proof and evidentiary burns that are actually, uh, harder than in a regular bond hearing, more protective, uh, in that there's a burden of production by HHS at the start. Uh, there's a right to be representative represented and there's an administrative appeal, uh, and on the opt in opt out, like this requires a, a notice with a box to check if you want a bond hearing. So we think the proceeding procedure here is as tiny number of kids each year. I think in 2018, it was 70 out of 50,000. So the notion that you would have an opt out at 49,930 cases just doesn't make a lot of sense. Uh, so the, the, and, and with those 49,000 HHS does not think they're a flight risk. It does not think they're a danger. And that's just like what happens in almost every case. So we think that bond hearing provision is really solid. It takes to heart this court's opinion. And it, remember in 1997, the same agency did bond hearings and immigration enforcement. Congress put the kids into a protective agency rather than an enforcement agency. And it having the bond hearing, having the hearing procedure there also, we think makes sense. It's consistent with Congress's design. The problem, and this goes to the remedy question, you didn't ask to modify the agreement in certain respects. You asked to terminate it. Um, under 60 D five. Um, and so I asked the same question I asked before. He would have come in and said, you know what, um, let's change this provision. First of all, I don't know whether you wouldn't have gotten an agreement. Second of all, if you did get agreement, um, maybe by that provision, but, um, because we now have changed circumstances, we have a whole different procedure in. Uh, and so we should modify that, but that isn't how this is preceded. So what do we do with that? We did ask for partial termination. And I think a very reasonable thing, given the state of the regulation and the way it incorporates almost all the floors agreement is the piece on HHS and the piece on initial apprehension, and which we haven't talked about because as judge bears on, you said at the beginning, it's identical to the agreement should terminate. And if you ask for a person, where and when we, it is in our August, I think, 29 or August 31st filing in district court. And we obviously asked for that on appeal in our briefs. Uh, I think the other side has said we haven't, and we asked for it at the hearing too. And judge G, uh, uh, told the parties if there's something that the floors agreement doesn't address, she might allow the rules to go into a place. But our point was for, for rules that are identical to the floors agreement, they should be the governance rules and the floors agreement should terminate for that aspect of the rules. So just a minute. So then would you go back to judge G and she would say section so-and-so and our, um, a and paragraph session, such and such, uh, and superseded. Uh, and then what, then you republish your regulations. So somebody hit them and understand what's in effect and what isn't. Well, I mean, we think it would be pretty straightforward given the dividing line for judge G to terminate the agreement, except with respect to family custody and let the regulations go into except with respect to family custody. And then we can fight about family custody further. And again, uh, judge, judge G didn't really consider that an option. And I don't think plaintiffs are really open to that kind of an option. Uh, but we think that that is a clear dividing line. It's very hard to justify continuing the agreement for initial custody and for the HHS rules. Uh, the, uh, I'm already over my rebuttal, rebuttal time. Uh, so, uh, the only other, I just want to clarify one other thing, uh, proposing counsel suggested that in the credible fear process, the family could be detained pending review by the court of appeals. I want to be clear that is not part of the expedited removal process. That process allows a quick, I think, review by an immigration judge, but it does not go to the BIA and it does not go to, to the court of appeals on a petition for review because it's an expedited review process. So you'll never have a situation. Excuse me. It does go to the court. No, uh, those cases all the time. Yeah. Those are full removal proceedings. And yes, those are not removal proceedings. They are reviews of the IHA's determination. As to withholding. Withholding of removal. That's a different issue. Uh, and again, part of the credible fear determination. Uh, no, well, your honor, I, I'm sorry, but, uh, the expedited review reviews, excuse me, expedited removal statute makes it clear that credible fear review does not go into the courts. Uh, and there's been litigation over whether that's constitutional. I think that's because I don't know what I'm doing. We get them asked to withhold them. Uh, withholding is a different, I mean, that's a substantive standard. And again, I think that would be if I don't think that review when it's applied to an expedited removal proceeding would go to the federal courts. But, uh, uh, what I'm really focused on is the credible fear piece. So, uh, what I'm trying to stress is the credible fear process designed to be quick. It is a border authority. It's not applied on the interior and it's applied to people captured near the border or at, or who appear at the border without documentation entered. So I again, want to stress, uh, we think these rules, uh, uh, update and, and implement the Florida settlement agreement. They are durable governing law that can be applied here and considered on their own terms and should be allowed to go into effect in place of the agreement. Thank you, Your Honor. Thank both sides for their arguments. Uh, Flores, uh, versus Barr are now submitted for decision. Thank both sides for their arguments.
judges: Tashima, W. Fletcher, Berzon